United States District Court
Southern District of Texas
F

MAY 2 9 1998

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### LAREDO DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF THE SURRENDER** | § | L-98-43 |
| | § | |
| **OF** | § | ~~Misc. No. L-98-2~~ |
| | § | (JDR) |
| **ELIZAPHAN NTAKIRUTIMANA** | § | |

## BRIEF OF THE LAWYERS COMMITTEE
## FOR HUMAN RIGHTS AS *AMICUS CURIAE*

Michael Posner
LAWYERS COMMITTEE
  FOR HUMAN RIGHTS
330 Seventh Avenue
New York, New York
(212) 845-5200

Loren Kieve
DEBEVOISE & PLIMPTON
555 13th Street, N.W.
Washington, D.C. 20004
(202) 383-8818

Attorneys for *Amicus Curiae,* Lawyers
  Committee for Human Rights

Of Counsel:

Donald Francis Donovan
P. Bradley O'Neill
Michael R. Potenza
DEBEVOISE & PLIMPTON
875 Third Avenue
New York, NY 10022
(212) 909-6000

## Table of Contents

Page

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.     The Legal Basis For The United States' Request To Surrender
         Respondent To The Rwanda Tribunal . . . . . . . . . . . . . . . . . . . . . 5

    II.    There Is No Constitutional Obstacle to the Surrender of
         Ntakirutimana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         A.     The United States Constitution Does Not Require A Treaty
              As A Predicate For Extradition . . . . . . . . . . . . . . . . . . . . 8

         B.     Public Law 104-106 Plainly Satisfies Any Constitutional
              Requirement That The Statute Must Implement A Treaty . . . . 20

    III.   The United States Has Demonstrated Ample Probable Cause
         to Surrender Respondent . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

## Table of Authorities

Page

### Cases

*B. Altman & Co. v. United States,*
224 U.S. 583 (1912)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Collins v. Loisel,*
259 U.S. 309 (1922)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 24, 27

*Cotzhausen v. Nazro,*
107 U.S. 215 (1883)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Eain v. Wilkes,*
641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894 (1981)  . . . . . . . . . . . . . . . .  24

*Egle v. Egle,*
715 F.2d 999 (5th Cir. 1983), *cert. denied,* 469 U.S. 1032 (1984)  . . . . . . . . . . . .  16

*Escobedo v. United States,*
623 F.2d 1098 (5th Cir.), *cert. denied,* 449 U.S. 1036 (1980)  . . . . . . . . . . .  22, 23

*Factor v. Laubenheimer,*
290 U.S. 276 (1933)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Grin v. Shine,*
187 U.S. 181 (1902)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Head Money Cases,*
112 U.S. 580 (1884)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Hilario v. United States,*
854 F. Supp. 165 (E.D.N.Y. 1994)  . . . . . . . . . . . . . . . . . . . . . . . .  11, 12, 13, 16
17

*In the Matter of the Surrender of Ntakirutimana,*
988 F. Supp. 1038 (S.D. Tex. 1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  *passim*

*Jimenez v. Aristeguieta,*
  311 F.2d 547 (5th Cir. 1962), *cert. denied*, 373 U.S. 914 (1963) . . . . . . . . . . . . . 23

*Neely v. Henckel,*
  180 U.S. 109 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Quinn v. Robinson,*
  783 F.2d 776 (9th Cir.), *cert. denied*, 479 U.S. 882 (1986) . . . . . . . . . . . . . . . 15

*Ramos v. Diaz,*
  179 F. Supp. 459 (S.D. Fla. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Shapiro v. Ferrandina,*
  478 F.2d 894 (2d Cir.), *cert. dismissed*, 414 U.S. 884 (1973) . . . . . . . . . . . . . . 24

*Terlinden v. Ames,*
  184 U.S. 270 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Belmont,*
  301 U.S. 324 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Blount,*
  123 F.3d 831 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 895 (1998) . . . . . . . . . . . 25

*United States v. Fernandez-Roque,*
  703 F.2d 808 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Hensley,*
  469 U.S. 221 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Kim Hong,*
  110 F.3d 103 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Pink,*
  315 U.S. 203 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Rauscher,*
  119 U.S. 407 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Valentine v. United States ex rel. Neidecker,*
  299 U.S. 5 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

20556574.02

*Weinberger v. Rossi*,
  456 U.S. 25 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Whitney v. Robertson*,
  124 U.S. 190 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams v. Rogers*,
  449 F.2d 513 (8th Cir. 1971), *cert. denied*, 405 U.S. 926 (1972) . . . . . . . 13, 14, 16
  18

## Constitution, Statutes and International Agreements

18 U.S.C. §§ 3181 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

18 U.S.C. § 3184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17, 22

18 U.S.C. § 3196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13
  18, 19

U.N. Charter, 59 Stat. 1031 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.N.S.C. Res. 955 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Agreement on Surrender of Persons Between the Government
  of the United States and the International Tribunal for Rwanda . . . . . . . . . . . . 6, 22

Antiterrorism Act of 1996, Pub. L. No. 104-132, Tit. IV, § 443(a), 110 Stat. 1280 . . 19

House Conference Rep. No. 104-518, 104th Cong., 2d Sess. 119 (1996) . . . . . . . . . 19

National Defense Authorization Act, Pub. L. No. 104-106, § 1342,
  110 Stat. 486 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. art. II, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const., arts. I-IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Const., art. VI, §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iv

## Miscellaneous

M. Cherif Bassiouni, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE
(3d ed. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

J.B. Moore, I TREATISE ON EXTRADITION AND INTERNATIONAL RENDITION
§16 (1891)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Betty Pisik, *Libya Scores Sanctions*, Washington Times, Jan. 28, 1998, at A12 . . . . . . 4

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS
LAW OF THE UNITED STATES § 402 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

v

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF THE SURRENDER** | § | |
| | § | |
| **OF** | § | Misc. No. L-98-2 |
| | § | (JDR) |
| **ELIZAPHAN NTAKIRUTIMANA** | § | |

**BRIEF OF THE LAWYERS COMMITTEE
FOR HUMAN RIGHTS AS *AMICUS CURIAE***

**Preliminary Statement**

The Lawyers Committee for Human Rights (the "Lawyers Committee")

respectfully seeks leave to file this brief as *amicus curiae,* in support of the United States'

second request for the surrender to the International Tribunal for Rwanda[1] (the "Rwanda

Tribunal") of Elizaphan Ntakirutimana, a Rwandan national charged by the Rwanda Tribunal

with genocide, complicity in genocide, conspiracy to commit genocide, and crimes against

humanity in connection with the killings of thousands of members of the Tutsi ethnic

minority in Mugonero and Bisesero, Rwanda, in the spring of 1994.

On December 17, 1997, Magistrate Judge Marcel C. Notzon issued a

Memorandum and Order denying the United States' first request for the surrender of

---

1.      The full name of the Tribunal is the "International Tribunal for the Prosecution of
        Persons Responsible for Genocide and Other Serious Violations of International
        Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens
        Responsible for Genocide and Other Such Violations Committed in the Territory of
        Neighboring States." *See* National Defense Authorization Act, Pub. L. No. 104-106,
        § 1342, 110 Stat. 486 (1996) ("Public Law 104-106").

Ntakirutimana to the Rwanda Tribunal on two grounds. *See In the Matter of the Surrender of Ntakirutimana*, 988 F. Supp. 1038 (S.D. Tex. 1997). First, Magistrate Judge Notzon held that the federal statute providing for the surrender of fugitives by the United States to the Rwanda Tribunal, Section 1342(a) of Public Law No. 104-106 (1996), is unconstitutional because it purports to authorize surrender of a fugitive in the absence of a formal Article II treaty of extradition, and therefore that he lacked jurisdiction to consider the United States' request. Second, the Magistrate Judge ruled that, in any event, the United States had failed to establish "probable cause" to support the surrender of Ntakirutimana.

These holdings are incorrect as a matter of law. Controlling Supreme Court precedent and pertinent authority from lower federal courts — which the Magistrate Judge failed to address — hold that a federal statute provides a proper basis for the surrender of a fugitive even in the absence of a treaty. Moreover, even if a treaty were required, Section 1342 implements the United States' obligations arising under a properly ratified Article II treaty — the United Nations Charter — and thus provides a valid basis to surrender Ntakirutimana to the Rwanda Tribunal.

Moreover, the Magistrate Judge's decision did not apply the proper standards in concluding that there was no "probable cause" to support the request for surrender. Under any fair evaluation of the supporting evidence — which included eyewitness accounts of Ntakirutimana's personal participation in mass murder — the evidence was sufficient to establish probable cause and thus to authorize his surrender to the Rwanda Tribunal.

2

The Lawyers Committee urges this Court to reconsider the Magistrate Judge's rulings. Adherence to his decision would seriously compromise the United States' ability to fulfill its international obligations to the Rwanda Tribunal arising under the United Nations Charter, and effectively permit a suspected war criminal to find asylum in the United States from charges properly leveled against him on behalf of the community of nations. Moreover, the failure to surrender Ntakirutimana will undermine the United States' efforts to encourage other nations — most notably Serbia and Croatia — to comply with their similar obligations to surrender suspected war criminals to the United Nations Tribunal for the former Yugoslavia. Neither law nor basic standards of justice permit such a result.

### Statement of Interest

The Lawyers Committee is a United States-based nongovernmental organization that has worked since 1978 to protect fundamental human rights and to hold governments to the standards defined by human rights and humanitarian law. The Lawyers Committee conducts fact-finding missions, publishes reports, and engages in sustained follow-up work with (i) locally-based human rights lawyers and activists, (ii) policy makers involved in formulating United States foreign policy, and (iii) intergovernmental organizations such as the United Nations, the Organization of American States, the Organization of African Unity, and the World Bank. The Lawyers Committee has consultative status with the United Nations, and has worked to promote international cooperation with the Rwanda Tribunal. In May 1995, for example, the Lawyers Committee wrote to representatives of forty nations asking what steps had been taken to implement

3

procedures for cooperation with the Rwanda Tribunal and reminding the representatives that all Member States of the United Nations are obligated to assist the Rwanda Tribunal.

Respondent is the first person that the United States has been requested to surrender to the Rwanda Tribunal. Thus, this case will set an important domestic precedent on the relationship of the United States to the Rwanda Tribunal and the United States' obligation to comply with lawful requests for the surrender of individuals who have been indicted by international tribunals.

Equally important, this case will also set a significant international precedent concerning the obligation of nations to cooperate with international criminal tribunals established under the auspices of the United Nations. The United States has been a world leader in demanding that other nations comply with their obligations to surrender indictees to international criminal tribunals, particularly the International Tribunal for the Former Yugoslavia, the tribunal created by the United Nations to prosecute war crimes arising in that area. The Magistrate Judge's decision has seriously embarrassed the United States in the world community, and emboldened states in the former Yugoslavia to continue to resist demands that they surrender their citizens to face trial before that international tribunal. Similarly, the U. N. Ambassador for Libya recently cited the case to defend his country's refusal to turn over Libyan nationals suspected of participating in the bombing of Pan Am Flight 103 for trial in Britain or the United States. *See* Betty Pisik, *Libya Scores Sanctions,* Washington Times, Jan. 26, 1998, at A12. Reconsideration of Magistrate Judge Notzon's decision is thus required to avoid continuing damage to United States foreign

4

policy, and to correct a misguided decision that will have serious adverse consequences for future enforcement of internationally recognized prohibitions against the most serious crimes known to the world community, crimes against humanity and genocide.

Because of the significance of this case, the Lawyer's Committee submitted a memorandum of law as *amicus curiae* in support of the United States' first request for the surrender of the respondent to the Rwanda Tribunal, outlining the obligation of the United States to cooperate with the Rwanda Tribunal under international and domestic law. A copy of that memorandum is attached hereto as Exhibit A. The Lawyers Committee now seeks to submit this supplemental memorandum to address the Magistrate Judge's decision and its reasoning.

### Statement of Facts and Procedural History

The Lawyers Committee relies on the statement of facts and procedural history set out in the Government's Memorandum in Support of Request for Surrender ("Gov't Mem.").

### Argument

I.    **The Legal Basis For The United States' Request To Surrender Respondent To The Rwanda Tribunal**

On November 8, 1994, the United Nations Security Council adopted Resolution 955, establishing "an international tribunal for the sole purpose of prosecuting persons responsible for genocide and other serious violations of international humanitarian law committed in the territory of Rwanda . . . between 1 January 1994 and 31 December 1994." U.N.S.C. Res. 955 (Nov. 8 1994), at 1, *reprinted in* 33 I.L.M. 1598 (1994). The

5

statute governing the Rwanda Tribunal (the "Tribunal Statute"), which is annexed to

Resolution 955, requires member states of the United Nations to "comply without undue

delay with any request for . . . the surrender or transfer of the accused to the International

Tribunal for Rwanda." Tribunal Statute, Art. 28, §§1, 2(e), *reprinted in* 33 I.L.M. 1598,

1612 (1994).

To carry out its obligations under Resolution 955, on January 24, 1995, the

United States entered into an agreement with the Rwanda Tribunal, called the Agreement on

Surrender of Persons Between the Government of the United States and the International

Tribunal for Rwanda (the "Surrender Agreement"), by which the United States agreed "to

surrender to the Tribunal, persons . . . found in its territory whom the Tribunal has charged

with or found guilty of a violation or violations within the competence of the Tribunal."

On February 10, 1996, Congress passed, and the President signed into law,

legislation to implement the Surrender Agreement.  Section 1342(a)(1) of Public Law No.

104-106 provides that, aside from certain limited exceptions concerning admissible evidence

and payments of fees and costs:

> [T]he provisions of chapter 209 of title 18, United States Code, relating to
> the extradition of persons to a foreign country pursuant to a treaty or
> convention for extradition between the United States and a foreign
> government [18 U.S.C. §§ 3181 *et seq*.], shall apply in the same manner and
> extent to the surrender of persons, including Untied States citizens, to . . .
> the International Tribunal for Rwanda, pursuant to the [Surrender]
> Agreement . . . .

Pub. L. No. 104-106, Div. A, Title XIII, § 1342(a)(1), 110 Stat. 486 (Feb. 10, 1996).

Among the provisions of Title 18 of the United States Code made applicable to surrender

proceedings brought under section 1342(a)(1) is 18 U.S.C. § 3184, which authorizes the

6

judge to issue a warrant for the arrest of the individual sought, to hold a hearing to consider the request for surrender, and, if the judge finds there is a sufficient basis for the request, to certify to the Secretary of State that the individual may be surrendered.

## II.    There Is No Constitutional Obstacle to the Surrender of Ntakirutimana

Section 1342(a)(1) of Public Law No. 104-106 provides a proper and lawful basis for the United States to request the surrender of the respondent to the Rwanda Tribunal and for the Court to certify the permissibility of his surrender to the Secretary of State. Indeed, absent the alleged constitutional defect identified by the Magistrate Judge, there would be no question that the Court is required to consider the United States' surrender request on its merits.

In his decision, however, the Magistrate Judge held that Section 1342(a) of Public Law 104-106 was unconstitutional, and therefore that there was no valid statute which gave the court jurisdiction to consider the Government's request to surrender Ntakirutimana. *Ntakirutimana*, 988 F. Supp. at 1042. The Magistrate Judge struck down the statute as unconstitutional because it purported to authorize the surrender of persons pursuant to an executive agreement — the Surrender Agreement — rather than pursuant to a treaty that had been ratified by two-thirds of the Senate pursuant to Article II, Section 2 of the Constitution. *Id.* In reaching this conclusion, the Magistrate Judge observed, incorrectly, that "[t]hroughout the history of this Republic, every extradition from the United States has been accomplished under the terms of a valid treaty of extradition." *Id.* Solely on the basis of this asserted historical practice — and despite the absence of any constitutional provision regulating international extradition or requiring a treaty before international extradition could be authorized — the Magistrate Judge held that "Congress has no independent authority to

7

regulate extradition and . . . a treaty of extradition is required before extradition can occur."
*Id.*

The Magistrate Judge's conclusion that Section 1342(a) is unconstitutional is incorrect for two fundamental reasons. First, the Constitution does not require the existence of an Article II treaty as a prerequisite before Congress can authorize extradition by statute. Rather, the decisions of the Supreme Court and other federal courts make clear that Congress can properly authorize extradition by statute in the absence of an Article II treaty. Second, even if extradition could be effected only pursuant to a treaty ratified by the Senate, Section 1342 was in fact passed to implement United States' treaty obligations arising under the United Nations Charter, and thus provides a valid jurisdictional basis for the United States' request for Ntakirutimana's surrender.

**A.      The United States Constitution Does Not Require
         A Treaty As A Predicate For Extradition**

The Magistrate Judge's holding that the existence of an Article II treaty is a constitutional prerequisite to the extradition of a fugitive is incorrect. The Magistrate Judge's ruling contradicts controlling Supreme Court precedent and the only prior decisions to consider this issue, most of which the Magistrate Judge did not even consider in his opinion. Rather than exercising appropriate caution before striking down an act of Congress, the Magistrate Judge's decision holds Section 1342 unconstitutional without identifying any basis in the Constitution to justify the sharp departure from this body of precedent. Instead, the Magistrate Judge's opinion relies upon assumptions about the

8

history of American extradition practice that are incorrect and would not, in any event, support the conclusion that the law is unconstitutional.

Controlling precedent compels the conclusion that Section 1342 of Public Law 104-106 is constitutional and provides a lawful basis for the United States' request for the surrender of Ntakirutimana. *First*, the United States Supreme Court has expressly held that a federal statute provides a constitutionally sufficient basis to extradite an international fugitive. In *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936), which the Magistrate Judge did not address in his decision, the Supreme Court held as a matter of domestic United States law that the Constitution requires some legislative authorization, either by treaty or statute, before the Executive Branch can exercise the power to extradite. This requirement derives not from any concern regarding the treaty-making provisions of the Constitution or its allocation of powers between the Executive and Congress in the field of foreign affairs, but from the due process rights of the individual whose extradition is sought. As the Supreme Court explained in *Valentine*, "the Constitution creates no executive prerogative to dispose of the liberty of the individual. . . . There is no executive discretion to surrender him to a foreign government, unless that discretion is granted by law." 299 U.S. at 9.

*Valentine* makes abundantly clear, however, that there is nothing in the Constitution that requires that authorization to the Executive to extradite must be derived from a treaty rather than from an act of Congress. On the contrary, the Court repeatedly held that the power of extradition may be conferred upon the Executive either by treaty or by

9

statute. Thus, the Court explained that "the legal authority [to extradite] does not exist save as it is given by act of Congress or by the terms of a treaty." *Id.* Similarly, the Court quoted a leading treatise on extradition for the proposition that there was no authority to extradite "in the absence of a conventional or legislative provision." *Id.* (quoting J.B. Moore, I TREATISE ON EXTRADITION AND INTERNATIONAL RENDITION §16 (1891)). Indeed, the problem in *Valentine* precluding extradition was that Congress had *failed* to enact a statute authorizing extradition except pursuant to a treaty. The treaty at issue in *Valentine* did not require the extradition of United States citizens, and the Court thus held that extradition could not be ordered "in the absence of statute conferring an independent power." 299 U.S. at 18.

*Second*, the *Valentine* Court's recognition that Congress could properly authorize extradition in the absence of any treaty obligation is consistent with other, long-settled Supreme Court authority. In *Grin* v. *Shine*, 187 U.S. 181, 191 (1902), for example, the Supreme Court held that "Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient."[2] *See also Terlinden v. Ames*, 184 U.S. 270, 289 (1901) ("[i]n the United States, the general

---

2.  The Magistrate Judge found that *Grin v. Shine* was "inapposite at best," and noted that there was a treaty between Russia and the United States in that case. *Ntakirutimana*, 988 F. Supp. at 1041. The Magistrate Judge's ruling missed the essential point. While there was a treaty in that case, Grin argued that extradition could not be ordered under the treaty because the proof offered in support of extradition did not satisfy the requirements of the treaty. Thus, the Supreme Court's holding was that Congress by statute could authorize extradition that was *not* authorized by the treaty.

opinion and practice has been that extradition should be declined in the absence of a

conventional or legislative provision") (citing J.B. Moore, I TREATISE ON EXTRADITION AND

INTERNATIONAL RENDITION §16 (1891)).

*Finally*, subsequent cases have applied the holdings of *Valentine* and similar

cases to reject precisely the arguments adopted by the Magistrate Judge and confirm that a

federal statute — standing alone — provides sufficient authority to extradite a fugitive in the

absence of any treaty. In *Hilario v. United States*, 854 F. Supp. 165, 173-74 (E.D.N.Y.

1994), a decision squarely on point, Portugal sought the extradition of an American citizen

convicted of murder in Portugal. Although the United States and Portugal were parties to an

extradition treaty, that treaty expressly provided that the United States had no obligation to

extradite American citizens. As a result, the sole basis for the United States' request to

extradite the respondent was 18 U.S.C. § 3196, a statute enacted in 1990 to fill the gap in

United States extradition law left by the Supreme Court's decision in *Valentine*. *Id*. at 169.

Section 3196 authorizes the extradition of United States citizens in certain circumstances as a

matter of comity even though "the applicable treaty or convention does not obligate the

United States to extradite its citizens to a foreign country." 18 U.S.C. § 3196; *see Hilario*,

854 F. Supp. at 166-67.

Hilario challenged the constitutionality of Section 3196 on the same grounds

that Ntakirutimana challenges the constitutionality of Section 1342 here. Specifically,

Hilario argued that "extradition from the United States is generally conducted only pursuant

to treaty," that therefore "any power to extradite must be conferred in accordance with the

treaty making provisions of art. II, § 2, cl. 2 of the Constitution," and that Section 3196 was

11

unconstitutional because it did not implement the provisions of any treaty. *See* 854 F. Supp. at 173.

The *Hilario* court flatly rejected these arguments. Initially, the court noted, the "fundamental problem" with Hilario's argument was that "there is no authority to support it." *Id.* On the contrary, following the Supreme Court's decision in *Valentine*, the court held that the power to extradite could constitutionally be conferred either "by legislation *or* by treaty amendment." *Id.* (emphasis in original). The rationale for the *Valentine* rule, the court held, was straightforward:

> It is not, after all, any treaty that demands conferral of power before the executive branch surrenders an American national. It is our own constitutional system. In *Valentine*, the Supreme Court expressly stated that, under that system, the power to extradite can be conferred either by legislation or by treaty amendment. . . . Both statutes and treaties are the supreme law of the land. Neither is superior to the other. Thus, either can serve the Constitution's requirement for the specific legal conferral of the power to extradite.

*Id.* (citations omitted).

The *Hilario* court also dismissed the petitioner's argument that the constitutional requirement for a treaty could be implied from the United States' past practice of generally effecting extradition only pursuant to a treaty. As the court explained, "[t]he reason the United States grants foreign extradition requests only pursuant to treaty is that Congress has so provided *by statute*." 854 F. Supp. at 173 (emphasis in original). Where Congress has properly granted the Executive Branch the authority to extradite a fugitive on the basis of a statute, as it had in *Hilario* through the passage of 18 U.S.C. § 3196, the court held that the Constitution did not require the existence of an Article II treaty as a

12

prerequisite to extradition, and therefore upheld the order certifying his extraditability. *Id.*
at 176.[3]

The Court of Appeals in *Williams v. Rogers*, 449 F.2d 513, 521 (8th Cir.
1971), *cert. denied,* 405 U.S. 926 (1972), adopted like reasoning to permit the surrender of
a member of the U.S. Air Force to a foreign country pursuant to the terms of an executive
agreement. In *Williams*, the Air Force sought to transfer an airman to the Phillippines
where, pursuant to an executive agreement between the two countries, he was to be turned
over to Philippine authorities to face trial for a kidnaping and attempted rape allegedly
committed in that country. The airman sought to enjoin the transfer in federal court, arguing
that it constituted a constructive extradition that was unlawful because no treaty of
extradition existed between the United States and the Phillippines.

The Court of Appeals upheld denial of the injunction. Even if construed as
an extradition, the Court held, the Air Force's actions were fully authorized by the executive
agreement with the Phillippines. *Id.* Although the executive agreement was not itself a
statute, the Court noted that the entry of the agreement had been authorized by a joint
resolution of Congress. *Id.* Under *Valentine*, such congressional action, together with the

_____

3.    Neither the memoranda filed by the United States nor the decision of the Magistrate
      Judge cited *Hilario*, although it is plainly the single decision most directly relevant to the
      issues raised in this case. Moreover, apparently unaware of *Hilario*, the United States
      mistakenly acknowledges in its Memorandum that "[t]he United States has not extradited
      without a treaty because . . . until 1996, when these statutes were enacted, our laws --
      not the Constitution -- have required the existence of a treaty." Gov't Mem. at 15.
      Although the Lawyers Committee agrees that it is only United States laws, and not the
      Constitution, which have generally made a treaty a requirement for extradition in the
      past, Section 3196, at issue in *Hilario*, was enacted in 1990 and authorized extradition
      even in the absence of a treaty.

13

executive agreement, provided the Air Force with sufficient authority to surrender the airman to the Phillippines for trial even in the absence of a treaty providing for extradition. *Id.*

These precedents demonstrate at least five errors in the Magistrate Judge's conclusion that Section 1342 is unconstitutional. *First*, the Magistrate Judge's decision offers no basis in the Constitution — indeed no authority at all — to support its conclusion that only a treaty and not a federal statute may constitutionally empower the Executive Branch to extradite a fugitive. In fact, there is nothing in the Constitution that provides support for such a ruling. The Constitution does not even mention international extradition, let alone provide that the Executive Branch's power to extradite fugitives must be derived from an Article II treaty. *See, e.g.*, U.S. Const., arts. I-IV; M. Cherif Bassiouni, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE at 34-35 (3d ed. 1996) ("there is nothing in the Constitution that mandates" the existence of a treaty "in order for extradition to be granted"). The only provision of the Constitution cited by the Magistrate Judge, art. II, cl. 2, is simply an affirmative grant of power to the President to make treaties with the advice and consent of the Senate. It does not prohibit the President from employing other means, including executive agreements, to carry out the foreign policy objectives of the United States, *see, e.g.*, *Weinberger* v. *Rossi*, 456 U.S. 25, 30 n.6 (1982) ("the President may enter into certain binding agreements with foreign nations without complying with the formalities required by the Treaty Clause of the Constitution"), and it imposes no restriction on Congress' power to enact legislation.

*Second*, there is no basis in international law to conclude that there must be a binding treaty providing for extradition before the United States may extradite a fugitive.

14

While it is true under international law that only a treaty may create a *duty* to extradite a
fugitive, the Supreme Court has made it plain that a nation's *power* to order extradition
exists and may be exercised, as a matter of comity, even where no treaty exists. *See United
States v. Rauscher*, 119 U.S. 407, 412 (1886) (in the absence of treaty, "there [is] no
well-defined obligation on one country to deliver up . . . fugitives to another, and though
such delivery was often made, it was upon the principle of comity, and within the discretion
of the government whose action was invoked"); *Factor v. Laubenheimer*, 290 U.S. 276, 287
(1933) ("While a government may, if agreeable to its own constitution and laws, voluntarily
exercise the power to surrender a fugitive from justice to the country from which he has fled
. . . the legal right to demand his extradition and the correlative duty to surrender him to the
demanding country exist only when created by treaty").[4]  The contrary conclusion reached
by the Magistrate Judge would effectively condition the United States' ability to extradite
international fugitives found within its borders upon the existence of a formal extradition
agreement with a foreign power.  There is simply no basis in law or common sense to
support such a restriction on the legislative authority of the United States to regulate this
aspect of the nation's sovereignty.  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS
LAW OF THE UNITED STATES § 402(1)(b) (1987) (" . . . a state has jurisdiction to prescribe
law with respect to . . . the status of persons, or interests in things, present within its
territory.").

---

4.     *See also Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.) (treaty creates right of foreign
       power to demand extradition and correlative duty of United States to surrender), *cert.
       denied*, 479 U.S. 882 (1986); *Ramos v. Diaz*, 179 F. Supp. 459, 460-61 (S.D. Fla.
       1959) (same).

15

20556574.02

*Third*, as a matter of domestic United States law, there is no basis to hold that a treaty has an ability to confer authority upon the executive that is superior to that of a federal statute. As *Hilario* aptly noted, treaties and federal statutes are equivalent for purposes of conferring powers upon the Executive Branch: both are considered the supreme law of the land and both are entitled to equal dignity. *See Hilario*, 854 F. Supp. at 173; U.S. Const., art. VI, § 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the Supreme Law of the Land."); *Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution a treaty is placed upon the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land and no superior efficacy is given to either over the other").[5]

*Fourth*, the factual basis upon which the Magistrate Judge rested his decision — the United States' purportedly uniform practice of extraditing fugitives only pursuant to treaty — is inaccurate and does not support the conclusion he reached. As *Hilario* and *Williams* demonstrate, the United States has not relied exclusively upon treaties when seeking to extradite fugitives, but has also relied upon federal statutes and executive agreements. *See Hilario*, 854 F. Supp. at 174 (statute); *Williams*, 449 F.2d at 521

---

5.   *See also Head Money Cases*, 112 U.S. 580, 599 (1884) ("The constitution gives [a treaty] no superiority over an act of Congress. . . . Nor is there anything in its essential character, or in the branches of government by which the treaty is made, which gives it . . . superior sanctity"); *Egle v. Egle*, 715 F.2d 999, 1013 (5th Cir. 1983) ("[u]nder our Constitution, treaties and statutes are equal in dignity"), *cert. denied*, 469 U.S. 1032 (1984).

16

(executive agreement). Moreover, even if the historical practice has generally been that extraditions have been based on treaties, that fact does not support the Magistrate Judge's conclusion that the practice is constitutionally required. As *Hilario* notes, the United States generally extradited fugitives pursuant to treaty provisions in the past because the federal *statutes* authorizing extradition required that extradition be effected pursuant to a treaty, not because the Constitution does. *See Hilario,* 854 F. Supp. at 173; 18 U.S.C. §§ 3181(a), 3184. Far from reflecting any constitutional limitation on the authority of federal statutes to provide for extradition, United States historical extradition practice confirms, if anything, that such statutes are fully capable of establishing the requirements of extradition.

*Finally*, the Magistrate Judge's conclusion that a treaty ratified by the Senate is required before a statute can permissibly authorize extradition is inconsistent with the recognition that the Supreme Court has given to the validity of executive agreements. It is well settled that the Executive Branch has authority to enter into binding international agreements which may have substantial impact on private rights, even though such executive agreements have not been submitted to the Senate for formal ratification. *See United States v. Belmont*, 301 U.S. 324, 329-31 (1937) (discussing presidential authority to enter into binding executive agreements); *United States v. Pink*, 315 U.S. 203, 229 (1942) (same). Here, the Surrender Agreement is an executive agreement lawfully entered into by the President in the exercise of his foreign affairs powers, and it was subsequently expressly approved by both houses of Congress through the passage of implementing legislation, Public Law 104-106. Where, as here, Congress has ratified or authorized an executive agreement through legislation or joint resolution, the agreement becomes functionally indistinguishable from an Article II treaty. *See Cotzhausen v. Nazro*, 107 U.S. 215 (1883)

17

(conventions entered into by postal service pursuant to federal authorizing statute have same status as treaties); *B. Altman & Co. v. United States*, 224 U.S. 583 (1912) (executive agreement entered into pursuant to federal authorizing statute constitutes a "treaty" sufficient to provide the Supreme Court with jurisdiction); *see* Gov't Mem. at 17-18 (citing cases). Accordingly, as the *Williams* Court held, congressional action implementing an executive agreement provides authority for extradition to the same extent as a statute implementing a treaty. *Williams,* 449 F.2d at 521.

The error of the Magistrate Judge's conclusion is also demonstrated by the consequences of his holding. In effect, the Magistrate Judge held that the Congress of the United States cannot authorize the extradition of a foreign national accused of the most fundamental crimes known to the international community unless it has previously gained the consent of a foreign jurisdiction or international entity to the terms of an extradition treaty. That holding represents an unprecedented limitation on the sovereignty of the United States and the ability of its political branches to carry out foreign policy. Moreover, the reasoning that underlies that holding cannot be limited to requests for the surrender of fugitives sought by international criminal tribunals under Section 1342. If the Magistrate Judge's decision were correct, the constitutionality of at least two other federal statutes would be called seriously into question. *First*, as noted above, the Magistrate Judge's reasoning would apply equally to the statute at issue in *Hilario*, 18 U.S.C. § 3196. *Second*, in 1996 Congress enacted 18 U.S.C. § 3181(b), which authorizes the United States to surrender, "in the exercise of comity," fugitives other than United States citizens or residents who have committed crimes of violence against United States nationals in foreign countries "without regard to the existence of any treaty of extradition." *Id.* This provision was enacted as part

18

of the Antiterrorism Act of 1996, Pub. L. No. 104-132, Tit. IV, § 443(a), 110 Stat. 1280, and was expressly intended "to permit[ ] the Attorney General to extradite persons . . . [accused of such violent crimes against United States citizens] to countries with which the United States does not have an extradition treaty." House Conference Rep. No. 104-518, 104th Cong., 2d Sess. 119 (1996), *reprinted in* 1996 U.S. Code Cong. & Ad. News, at 952. Neither 18 U.S.C. § 3196 nor 18 U.S.C. § 3181(b) could survive the Magistrate Judge's holding.[6]

In sum, the Magistrate Judge's holding finds no support in the Constitution; it is squarely contradicted by controlling precedent; and it would condition the authority of the political branches to formulate extradition policy for the United States on their ability to negotiate treaties with foreign nations and international bodies. The Lawyers Committee respectfully suggests that the Magistrate Judge's holding that Congress cannot enact a statute to implement the foreign policy of the United States by authorizing the extradition of a foreign national wanted by an international tribunal for the crime of genocide in his homeland simply cannot stand.

---

6. In his decision, the Magistrate Judge dismissed the significance of Section 3181(b) here, asserting that "every case construing this section has required that a valid treaty exist[]." *Ntakirutimana*, 988 F. Supp. at 1041. The Magistrate Judge was clearly mistaken. None of the cases cited in the Magistrate Judge's decision mentions Section 3181(b) or involves violent crimes subject to its terms. In addition, Section 3181(b) was not passed until 1996, and the Magistrate Judge's citation to a 1954 case is obviously in error. In fact, the only case to date that has mentioned Section 3181(b), other than the Magistrate Judge's opinion itself, acknowledges that the statute provides an exception to the general practice of extradition by treaty. *United States v. Kim Hong*, 110 F.3d 103, 130 n.9 (1st Cir. 1997) (dissenting opinion).

19

**B.** **Public Law 104-106 Plainly Satisfies Any Constitutional Requirement That The Statute Must Implement A Treaty**

Even if there were a requirement that extradition legislation, to be valid, must implement an Article II treaty, the Magistrate Judge's decision would still be incorrect.

The United Nations Charter is an Article II treaty ratified with the advice and consent of the Senate. *See* 59 Stat. 1031 (1945). The Charter requires the United States to "accept and carry out" the decisions of the United Nations Security Council. U.N. Charter, arts. 25, 48(1).

As set forth above, Security Council Resolution 955 requires member states — including the United States — to "cooperate with the International Tribunal for Rwanda" by, among other things, surrendering accused war criminals. *See* pp. 5-7, above. Both the Surrender Agreement and Section 1342 of Public Law No. 104-106, which incorporates the Surrender Agreement by reference, expressly seek to comply with the United States' obligations under Security Council Resolution 955 and therefore under the United Nations Charter. As such, Public Law 104-106 is plainly a constitutional exercise of congressional power under Article I, Section 8 of the Constitution, which authorizes Congress "to enact such legislation as is appropriate to give efficacy to any stipulations . . . in a treaty with a foreign power." *Neely v. Henckel*, 180 U.S. 109, 121 (1901).

The Supreme Court's decision in *Neely* makes clear that such congressional action authorizing extradition in order to implement a treaty is valid, even where the treaty does not expressly provide for extradition, and even where the statute purports to authorize extradition to a third country that was not a party to the treaty the statute is seeking to implement. In *Neely*, the Supreme Court upheld the constitutionality of a federal statute

20

providing for the extradition of fugitives to Cuba, while that country was occupied by American military forces following the Spanish-American War, even though the Court held that Cuba was a "foreign territory" with which the United States had no treaty of extradition. 180 U.S. at 119-22. At the conclusion of the war, the United States and Spain had entered into a treaty which obligated the United States, among other things, to "protect life and property in Cuba pending its control and occupancy of that island." *Id.* at 121-22. The Court held that the subsequent passage of the extradition statute was an appropriate congressional action to "protect life and property in Cuba," and thus to implement the treaty with Spain, and was therefore fully consistent with article I, section 8 of the Constitution. *Id.* at 122.

Like the statute in *Neely*, Section 1342 of Public Law No. 104-106 implements the United States' obligations arising under a treaty, the United Nations Charter, and is therefore a constitutionally proper basis for seeking Ntakirutimana's surrender.

## III.     The United States Has Demonstrated Ample Probable Cause to Surrender Respondent

Notwithstanding the Magistrate Judge's ruling that he did not have jurisdiction to entertain the United States' surrender request, the Magistrate Judge went on to consider the United States' request on its merits, and concluded that it did not establish probable cause to believe that Ntakirutimana had committed the crimes charged against him. Although recognizing that he could not consider evidence contradicting the evidence presented in the surrender request, the Magistrate Judge ruled that he was nevertheless "free to exercise [his] discretion in judging the credibility of the evidence presented. . . ." 988 F. Supp. at 1042. On this basis, the Magistrate Judge then gave

21

intense scrutiny to the evidence submitted, found reasons to discredit much of that evidence on a variety of grounds, and thus concluded that the evidence did not establish probable cause.

The Magistrate Judge applied an incorrect standard in reviewing the evidence submitted in support of the surrender request and thereby reached an erroneous result. The United States, in its second request for surrender, has submitted additional proof to satisfy many of the concerns raised by the Magistrate Judge, and there should no longer be any serious question that the evidence is now sufficient to meet the probable cause standard. But to the extent that the issues raised by the Magistrate Judge may remain, the Court should be aware of the error in the Magistrate Judge's standard and result.

As the Magistrate Judge recognized, 988 F. Supp. at 1042, a court reviewing a surrender request is required to apply the "probable cause" standard. *See*, *e.g.*, *Escobedo* v. *United States*, 623 F.2d 1098, 1102 (5th Cir.) (test is "the existence of probable cause to sustain the charges against petitioners 'or, in other words, the existence of a reasonable ground to believe the accused guilty'") (citation omitted), *cert. denied,* 449 U.S. 1036 (1980). Section 3184 provides that the court must determine whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The Surrender Agreement, in turn, states that the evidence must establish that "there is a reasonable basis to believe that the person sought has committed the violation or violations for which surrender is requested." Surrender Agreement, Art. 2, ¶ 3. There is no dispute here that the

22

"reasonable basis" test of the Surrender Agreement is functionally equivalent to the "probable cause" standard generally applied in extradition proceedings.

In applying the probable cause standard, the Court must bear in mind the special nature of extradition proceedings. The Court must not impose too high a standard on the surrender request, because "[t]he result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, . . . in plain contravention of the intent and meaning of the extradition treaties." *Collins v. Loisel*, 259 U.S. 309, 316 (1922). As the Supreme Court explained in *Collins*, "[t]he function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Id*. Accordingly, it is well settled that extradition proceedings can be based on hearsay, *Escobedo*, 623 F.2d at 1102 n.10 –- indeed, the Court in *Collins* held that extradition could be based on "unsworn statements of absent witnesses." 259 U.S. at 317. Similarly, the extraditee has no right to present evidence attempting to support a defense, *see Collins*, 259 U.S. at 316; *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962), *cert. denied*, 373 U.S. 914 (1963); rather, the Court's role is to determine whether the papers in support of the extradition are sufficient to make out a *prima facie* case.

Contrary to the Magistrate Judge's ruling, the Court does not have free rein to disregard on credibility grounds the evidence submitted in support of a surrender

23

request.  Although the law on this point is not settled, *see* Gov't Mem. at 19-20, the

weight of authority and the better rule is that the Court has no power to reject

documentary evidence presented to it on credibility grounds.  *See, e.g., Eain v. Wilkes,*

641 F.2d 504, 511 (7th Cir.) ("[a]n accused in an extradition hearing has no right . . .

to pose questions of credibility as in an ordinary trial"), *cert. denied,* 454 U.S. 894

(1981); *Shapiro v. Ferrandina*, 478 F.2d 894, 904-05 (2d Cir.), *cert. dismissed,* 414

U.S. 884 (1973).  As Judge Friendly explained in *Shapiro*, the Magistrate Judge's

rejection of the evidence presented on credibility grounds is inconsistent with the limited

nature of an extradition hearing:

> The magistrate's function is to determine whether there is "any" evidence
> sufficient to establish reasonable or probable cause, and the extraditee's
> right to introduce evidence is thus "limited to testimony which explains
> rather than contradicts the demanding country's proof . . . ."  The judge's
> refusal to examine the credibility of the testimony and statements included
> in the translated material was clearly proper, since the declarants were not
> before him.   . . .  Such a contest [over credibility] . . . should properly
> await trial in Israel.

478 F.2d at 905 (citation omitted).

The Magistrate Judge's approach is also inconsistent with the Supreme

Court's admonition in *Collins* that extradition could properly be based on "unsworn

statements of absent witnesses."  259 U.S. at 317.  While an extradition judge would

reasonably be entitled to make credibility determinations regarding any witnesses who

appear before him, it is hard to see on what basis the judge could make reasoned

judgments about the credibility of witness statements and other documentary evidence.

24

This point is amply demonstrated by Magistrate Judge Notzon's rejection of the evidence here. The Magistrate Judge's attempt to assess the credibility of the witness statements presented here was riddled with errors, and only serves to demonstrate that this approach is not feasible. For example, the evidence presented includes eyewitness testimony that Ntakirutimana personally participated in the mass murder of Tutsis. As the Magistrate Judge acknowledged, Witness H stated that "he saw the Extraditee, along with three others, armed with guns shoot at a group of Tutsis and that some of these Tutsis died." 988 F. Supp. at 1043. It is inconceivable that this evidence, in the context of the massacres described in the extradition affidavits, is not sufficient to establish probable cause to believe that Ntakirutimana is guilty of the crimes charged. Yet the Magistrate Judge states a variety of grounds for refusing to accept that this testimony is sufficient. The Magistrate Judge points out that there is no statement that the witnesses have given reliable information in the past, *id.*, but this observation is utterly inapposite. The witnesses here, including Witness H, are all "ordinary civilians," who happened to be eyewitnesses to terrible crimes. *Id.* It is well settled that such eyewitness statements are "presumed credible without subsequent corroboration." *United States v. Blount*, 123 F.3d 831, 835 (5th Cir. 1997) (*en banc*), *cert. denied*, 118 S. Ct. 895 (1998).

The Magistrate Judge also objected that the witnesses are not identified, except by letter. 988 F. Supp. at 1043. Apart from the fact that it is hard to see how the names of these witnesses would have assisted the Magistrate Judge in making his determination of probable cause, the use of letters in place of names was plainly

25

intended to protect the safety of witnesses, against a background of the most extreme danger of retaliation from Hutu forces. *See* Prosper Declaration ¶ 15(g). This was plainly a reasonable security measure, mandated by the Prosecutor's obligation to protect the safety of witnesses, *id.*, and has no bearing on the credibility of any witness' testimony.

The Magistrate Judge also questioned the reliability of the witness' identification of a photograph of Ntakirutimana. 988 F. Supp. at 1043. However, virtually all of the witnesses, including Witness H, knew Ntakirutimana personally. Prosper Declaration ¶ 15(e). In these circumstances, it is well settled that "[t]here is no question of reliability" of an identification where a witness knows a defendant personally, and a photograph is shown to the witness simply to verify that the photograph is the same person about whom the witness has been talking. *See*, *e.g.*, *United States v. Fernandez-Roque*, 703 F.2d 808, 814 (5th Cir. 1983).

Similarly, the Magistrate Judge objected to the fact that the officer making the affidavit did not personally interview the witnesses, and was relying on the reports of other officers. 988 F. Supp. at 1043. But this fact, too, is constitutionally irrelevant to the existence of probable cause. *See*, *e.g.*, *United States v. Hensley*, 469 U.S. 221, 231 (1985) ("admissibility turns on whether the officers who *issued* the flyer possessed probable cause," not whether arresting officer has personal knowledge of the facts) (emphasis added).

Finally, the Magistrate Judge pointed out that "there is not even any indication that these witnesses were placed under oath prior to making their statements."

26

988 F. Supp. at 1043.  Again, however, this is an improper consideration in an extradition hearing.  As the Supreme Court held in *Collins*, extradition is properly based on the "unsworn statements of absent witnesses."  259 U.S. at 317.

   For similar reasons, the Magistrate Judge erred in refusing to accept Witness I's testimony that he saw Ntakirutimana shooting at Tutsi civilians.  988 F. Supp. at 1043-44.  The Magistrate Judge also erred as a matter of law in concluding that the testimony of Witnesses C and H, that Ntakirutimana personally instructed other armed Hutus to take the roof off his church so that it could not be used as a shelter by Tutsis attempting to hide from murderous gangs of Hutus, did not at least show Ntakirutimana's complicity in genocide.  988 F. Supp. at 1044 & n.6.  The Magistrate Judge's conclusion that this evidence was insufficient to make out a *prima facie* case that respondent participated in the Bisesero attacks is profoundly mistaken, and reflects a fundamental misunderstanding of the role of the extradition magistrate.

## Conclusion

For the foregoing reasons, the Lawyers Committee for Human Rights

respectfully submits that the Court should certify to the Secretary of State that Ntakirutimana

may be surrendered to the Rwanda Tribunal.

Dated: April 24, 1998
New York, New York

Respectfully submitted,

Michael Posner
LAWYERS COMMITTEE
  FOR HUMAN RIGHTS
330 Seventh Avenue
New York, New York
(212) 845-5200

Of Counsel:

Donald Francis Donovan
P. Bradley O'Neill
Michael R. Potenza
DEBEVOISE & PLIMPTON
875 Third Avenue
New York, NY 10022
(212) 909-6000

DEBEVOISE & PLIMPTON

_Loren Kieve_

By:   Loren Kieve

555 13th Street, N.W.
Washington, D.C. 20004
(202) 383-8818

Attorneys for *Amicus Curiae*, Lawyers
  Committee for Human Rights

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

- - - - - - - - - - - - - - - x

IN THE MATTER OF THE              :

SURRENDER OF                      :        Misc. No. L-96-005

ELIZAPHAN NTAKIRUTIMANA           :

- - - - - - - - - - - - - - - x

## BRIEF OF THE LAWYERS COMMITTEE
## FOR HUMAN RIGHTS AS AMICUS CURIAE

### Preliminary Statement

The Lawyers Committee for Human Rights ("Lawyers

Committee") respectfully seeks leave to file a brief in this

matter as <u>amicus</u> <u>curiae</u>.  The Lawyers Committee strongly

supported the creation of the International Tribunal for Rwanda

("Rwanda Tribunal"),[1] and endorses full United States'

cooperation with the Tribunal.  This case represents the first

time that the United States has been requested to surrender a

person indicted by the Rwanda Tribunal.  The Lawyers Committee

---

[1] The full name of the Tribunal is the "International
Tribunal for the Prosecution of Persons Responsible for Genocide
and Other Serious Violations of International Humanitarian Law
Committed in the Territory of Rwanda and Rwandese Citizens
Responsible for Genocide and Other Such Violations Committed in
the Territory of Neighboring States."  <u>See</u> National Defense
Authorization Act, Pub. L. No. 104-106, § 1342, 110 Stat. 486
(1996).

believes that, as such, this case will set an important precedent
for future cases, and for the future relationship between the
United States and the Tribunal.

In this brief, the Lawyers Committee seeks to assist
the Court by explaining clearly the obligations of the United
States in this case, under national and international law. We
believe that this brief may be particularly helpful to the Court
in light of the inaccurate view of the Rwanda Tribunal and the
United States' obligations under domestic and international law
contained in the memorandum filed by respondent Elizaphan
Ntakirutimana (Respondent's Memorandum in Opposition, hereinafter
"Resp. Mem.").

### Statement of Interest

The Lawyers Committee for Human Rights is a United
States-based non-governmental organization that has worked since
1978 to protect and promote fundamental human rights around the
world, and to hold governments to the standards defined by human
rights and humanitarian law.  The Lawyers Committee conducts
fact-finding missions and publishes reports, which serve as a
starting point for sustained follow-up work with locally-based
human rights lawyers and activists, policymakers involved in
formulating United States foreign policy, and intergovernmental

2

organizations such as the United Nations, the Organization of
American States, the Organization of African Unity, and the World
Bank. The Lawyers Committee has consultative status with the
United Nations, and has worked to promote international
cooperation with the Rwanda Tribunal. In May 1995, for example,
the Lawyers Committee wrote to representatives of forty nations
asking what steps had been taken to implement procedures for
cooperation with the Tribunal and reminding the representatives
that all Member States[2] of the United Nations are obligated to
assist the Tribunal.

The Lawyers Committee also strongly supports the
creation of an effective, permanent International Criminal Court
to prosecute individuals who commit serious crimes under
international law, including genocide and crimes against
humanity. Proposals to establish such an international court are
now under active consideration under United Nations auspices.
The decision of this Court concerning the United States'
obligation to surrender individuals indicted by the Rwanda
Tribunal will be of additional importance because of its

---

[2] Throughout this brief, the Lawyers Committee will use the
term "State" as it is used in international law, to mean
"country" or "nation."

3

precedential impact in defining the United States' obligations to the proposed international court.

## Statement of Facts

The Lawyers Committee relies on the statement of facts and procedural history set out in the Government's Memorandum of Law in Support of the Surrender of Elizaphan Ntakirutimana.

4

**A R G U M E N T**

I.   **THE UNITED STATES IS LEGALLY OBLIGATED TO COMPLY WITH
     SURRENDER REQUESTS MADE BY THE RWANDA TRIBUNAL**

The United States is clearly obligated by law to honor

the request of the Rwanda Tribunal for the surrender of

respondent Elizaphan Ntakirutimana.  Ntakirutimana has been

indicted by the Rwanda Tribunal on charges that he committed

genocide and crimes against humanity in Rwanda during the period

from April through June 1994.  The United States' binding

obligation to surrender Ntakirutimana to the Tribunal to face

these charges stems from the United States' obligations under

international treaties and international law, which have been

incorporated into U.S. domestic law by congressional legislation

and executive agreement.

A.   **The Creation Of The Rwanda Tribunal**

1.   **The Tribunal Was Created To Bring To Justice
         Individuals Who Have Committed Serious Violations
         Of International Humanitarian Law**

On April 6, 1994, Juvenal Habyarimana, President of

Rwanda and a member of the Hutu ethnic group, was killed when the

aircraft carrying him was attacked and downed.  This disaster

triggered widespread ethnic violence in Rwanda, including

systematic and widespread attacks by Hutus against Rwandans of

5

the Tutsi ethnic group, whom many Hutus blamed for the President's death.

On July 1, 1994, the United Nations Security Council, alarmed by reports of serious violations of international humanitarian law being committed in Rwanda, adopted Resolution 935, which requested the U.N. Secretary-General to establish an impartial commission of experts to investigate the massacres and killings in Rwanda. See Report of the Secretary-General Pursuant to Paragraph 5 of Security Council Resolution 955, U.N. Doc. S/1995/134, February 13, 1995 (hereinafter "Sec'y-Gen'l Report"), at 1. The Secretary-General appointed the Commission of Experts shortly thereafter. See Letter Dated 9 December 1994 from the Secretary-General Addressed to the President of the Security Council, U.N. Doc. S/1994/1405, Dec. 9, 1994 (hereinafter "Sec'y Gen'l Ltr."), at 3.

The Commission of Experts conducted two field missions; consulted with the national authorities of Rwanda, Burundi, Tanzania and Zaire, U.N. officials, representatives of international and local non-governmental organizations, and diplomatic representatives; and reviewed thousands of pages of documents received from the parties to the Rwandan conflict. See Annex to Sec'y Gen'l Ltr., at 8-13 (final report of Commission).

6

CHPDF - www.fastio.com

The Commission found that roughly 500,000 people were murdered in
Rwanda between April 6, 1994 and July 15, 1994.  <u>Id</u>. at 20.

    The Commission concluded that crimes against humanity
and serious violations of international humanitarian law were
committed by individuals on both sides of the conflict.  <u>Id</u>. at
35.  The Commission also found that there was "overwhelming
evidence to prove that acts of genocide against the Tutsi group
were perpetrated by Hutu elements in a concerted, planned,
systematic and methodical way," in violation of Article II of the
1948 International Convention on the Prevention and Punishment of
the Crime of Genocide.  <u>Id</u>.  The Commission found that there was
no evidence to suggest that acts committed by Tutsi elements were
committed with an intent to destroy the Hutu ethnic group, within
the meaning of the Genocide Convention.  <u>Id</u>.  The Commission
nonetheless expressed its concern over the ongoing violence
committed by Tutsi elements, particularly the Rwandanese
Patriotic Front ("RPF"), and recommended that investigation of
violations of international human rights law attributed to the
RPF continue.  <u>Id</u>. at 35-36.

    The Commission of Experts recommended that the
individuals responsible for committing serious violations of
international humanitarian law in Rwanda should be brought to

7

justice before an independent and impartial international criminal tribunal. See Sec'y-Gen'l Report at 1. On November 8, 1994, the Security Council acted upon that recommendation, and adopted Resolution 955. Id. Resolution 955 established "an international tribunal for the sole purpose of prosecuting persons responsible for genocide and other serious violations of international humanitarian law committed in the territory of Rwanda and Rwandan citizens responsible for genocide and other such violations committed in the territory of neighboring states, between 1 January 1994 and 31 December 1994." U.N. S.C. Res. 955 (Nov. 8, 1994), at 1, reprinted in 33 I.L.M. 1602 (1994). The Security Council simultaneously adopted a Statute governing the International Criminal Tribunal for Rwanda (the "Statute"), which was annexed to Resolution 955. See id. at 3-15.

The Rwanda Tribunal was established with the strong support of the United States Government, and the Tribunal has continued to receive substantial financial support from the United States. As Madeleine Albright, then-U.S. Ambassador to the United Nations, stated during a visit to Rwanda in January 1996: "The United States was at the forefront in creating the International Tribunal and remains at the forefront in supporting its critical work." See Statement by U.S. Ambassador Madeleine

8

K._Albright, Kigali, Rwanda, January 21, 1996, USUN Press Release
#009-(96) (1996).

The Tribunal has jurisdiction to prosecute only
individuals -- and not ethnic groups -- who are responsible for
committing genocide and other serious violations of international
humanitarian law.  See Resolution 955 at 1-2.[3]  The Tribunal's
jurisdiction extends to:  (1) genocide; (2) crimes against
humanity; and (3) violations of Article 3 common to the Geneva
Conventions of August 12, 1949 for the Protection of War Victims
and the Additional Protocol II thereto of June 8, 1977.  Statute,
Art. 2-4.  The latter violations include acts of terrorism,
murder, mutilation, and the taking of hostages.  Statute, Art. 4.

Thus, the crimes over which the Tribunal has
jurisdiction were well established violations of international
law long before 1994.  See Sec'y Gen'l Report at 21-34.[4]  There

---

[3]  Thus, contrary to respondent's repeated assertion (see
Resp. Mem. at 35), it is not true that the Tribunal was
established only to prosecute Hutus.

[4]  As the Government notes (see Government's Reply
Memorandum at 7 n. 9, hereinafter "Gov. Rep. Mem."), Rwanda was a
party to the International Convention against Genocide at the
time of Ntakirutimana's alleged conduct in 1994.  The United
States is also a party to the Genocide Convention, having signed
it in 1948 and ratified it in 1988. See Multilateral Treaties
Deposited With the Secretary-General, Status as at 31 December
(continued...)

9

can be no plausible claim that the Tribunal's prosecution of
individuals like the respondent who are charged with committing
such crimes in 1994 violates ex post facto principles.

>    **2.  The United Nations Properly Exercised Its
>         Authority In Creating The Tribunal**

In creating the Tribunal, the Security Council acted
pursuant to Chapter VII of the United Nations Charter.  Article
39 provides that "[t]he Security Council shall determine the
existence of any threat to the peace, breach of the peace, or act
of aggression and shall make recommendations, or decide what
measures shall be taken in accordance with Articles 41 and 42, to
maintain or restore international peace and security."  This
provision empowers the Security Council to take action with
respect to a "threat to the peace," whether it arises in the
context of an international conflict or an internal armed
conflict.  Prosecutor v. Tadic, 35 I.L.M. 32, 43 (Yugoslavia
Tribunal 1995).  Article 42 authorizes the Security Council to
adopt measures of a military nature, and is not relevant here.
Prosecutor v. Tadic, 35 I.L.M. at 44.

-------------------

[4](...continued)
1993, ST/LEG/SER.E/12 at 92.

Article 41, in contrast, expressly authorizes the
Security Council to adopt "measures not involving the use of
armed force" to deal with threats to peace.  Article 41 provides:

> The Security Council may decide what measures not
> involving the use of armed force are to be
> employed to give effect to its decisions, and it
> may call upon the Members of the United Nations to
> apply such measures.  These may include complete
> or partial interruption of economic relations and
> of rail, sea, air, postal, telegraphic, radio, and
> other means of communication, and the severance of
> diplomatic relations.

U.N. Charter, Art. 41.

Thus, the claim in respondent's memorandum that the
U.N. Security Council is only empowered to adopt military
measures to respond to threats to the peace (see Resp. Mem. at
22) is simply mistaken.  Indeed, the International Criminal
Tribunal established to try persons suspected of having committed
crimes in the former Yugoslavia recently upheld the validity of
the Security Council's establishment of that Tribunal under
Article 41.  Prosecutor v. Tadic, 35 I.L.M. at 44.  As the
Yugoslavia Tribunal explained, an international criminal tribunal
"matches perfectly the description in Article 41 of 'measures not
involving the use of force.'"  Id.  The fact that such a tribunal
is not among the specific measures listed in Article 41 is of no

11

moment, because those measures are only illustrative examples, which "do not exclude other measures."  Id.

It would be inappropriate for this Court to consider the validity of the Security Council's establishment of the Rwanda Tribunal under Chapter VII of the U.N. Charter.  The Court's inquiry would be inconsistent with international comity and interfere with the exclusive authority of the Executive Branch to conduct foreign affairs (see Gov. Rep. Mem. at 8-9), particularly since the United States was one of the prime supporters of establishment of the Rwanda Tribunal at the United Nations.  Moreover, as explained below, both the Executive Branch and Congress have accepted the legitimacy of the Rwanda Tribunal, by executing a Surrender Agreement with the Tribunal and implementing that Agreement in domestic legislation.

But even if this Court assumed authority to consider the issue, there is no question that Chapter VII of the U.N. Charter authorizes the Security Council to establish the Tribunal.  The Rwanda Tribunal was properly established under Article 41, as was the Yugoslavia Tribunal that preceded it. In creating the Rwanda Tribunal, the Security Council determined that the internal armed conflict in Rwanda constituted "a threat to international peace and security."  Resolution 955 at 1.  It

12

further determined to "put an end to such crimes and to take

effective measures to bring to justice the persons who are

responsible for them," and expressed its belief that the

establishment of the Rwanda Tribunal "would contribute to the

process of national reconciliation and to the restoration and

maintenance of peace." Id. Given these findings, the Security

Council's authority to establish the Rwanda Tribunal pursuant to

Articles 39 and 41 is clear. See Tadic, 35 I.L.M. at 42-48.

> **3. Members Of The United Nations, Including The
> United States, Are Obliged By Law To Cooperate
> With The Rwanda Tribunal**

The United States was one of the founding members of

the United Nations in 1945. The United States is a party to the

United Nations Charter, which is a multilateral treaty ratified

by Congress. 59 Stat. 1031 (1945). There can be no doubt that

the United States is bound as a matter of both domestic and

international law to the obligations it incurs through its

participation in the U.N.

Member States of the United Nations, including the

United States, are obliged to abide by and carry out decisions

made by the Security Council. Article 25 of the U.N. Charter

states that "members of the United Nations agree to accept and

carry out the decisions of the Security Council in accordance

13

with the present Charter."  Article 48(1) reinforces Article 25,

providing that "all Members of the United Nations" shall take

"[t]he action required to carry out decisions of the Security

Council for the maintenance of international peace and security."

As discussed above, the Security Council established the Rwanda

Tribunal after finding that the internal armed conflict in Rwanda

was "a threat to international peace and security," and that the

Tribunal would "contribute to the . . . restoration and

maintenance of peace."  Resolution 955 at 1.  It follows that all

Member States of the United Nations are obligated by Articles 25

and 48(1) to assist the Security Council in carrying out its

decision to create and operate the Tribunal.

In addition, the Security Council in the Resolution

establishing the Tribunal called upon Member States to "cooperate

fully with the International Tribunal and its organs in

accordance with the present resolution and the Statute of the

International Tribunal for Rwanda."  Id. at 2.  The Security

Council further directed that "all States shall take any measures

necessary under their domestic law to implement the provisions of

the present resolution and the Statute, including the obligation

of States to comply with requests for assistance or orders issued

by a Trial Chamber under Article 28 of the Statute."  Id.

14

Article 28, in turn, specifically requires Member

States to surrender persons indicted by the Rwanda Tribunal:

> 1.   States shall cooperate with the International
> Tribunal for Rwanda in the investigation and
> prosecution of persons accused of committing
> serious violations of international humanitarian
> law.
>
> 2.   States shall comply without undue delay with
> any request for assistance or an order issued by a
> Trial Chamber, including, but not limited to:
>
> . . .
>
> (d) the arrest or detention of persons;
>
> (e) the surrender or transfer of the accused to
> the International Tribunal for Rwanda.

Rwanda Tribunal Statute, Art. 28.

Members of the United Nations are thus required,

pursuant to Articles 25 and 48(1) of the U.N. Charter, to "take

any measures necessary under their domestic law" to effect the

surrender of persons indicted by the Rwanda Tribunal to that

Tribunal.  Eleven countries, including the United States, have

enacted domestic legislation enabling them to cooperate with the

Rwanda Tribunal.  See Amnesty Int'l, International Criminal

Tribunals:  Handbook for Government Cooperation 42 (August 1996)

(hereinafter "Handbook for Government Cooperation").  Four other

countries have formally stated that no legislation is necessary

15

to ensure full cooperation, and several other countries are in

the process of preparing such legislation.  Id.  Indeed, three

countries -- Belgium, Zambia and Cameroon -- have already

surrendered fugitives to the Tribunal.  See id. at 23-24, 50;

U.S. Dep't of State, Daily Press Briefing No. 13 (January 23,

1997); "Rwanda Suspects Detained," Washington Post, Nov. 12,

1996, at A14.[5]

**B.    The United States Is Obligated Under Domestic Law To
Surrender Defendants To The Rwanda Tribunal**

The United States has responded to the Security

Council's call for cooperation with the Rwanda Tribunal, first by

signing a Surrender Agreement with the Rwanda Tribunal, see

Agreement On Surrender of Persons, Jan. 24, 1995, U.S.-Int'l

Trib. Rwanda ("Surrender Agreement"), and second by congressional

enactment of domestic legislation to implement the Agreement, see

National Defense Authorization Act Pub. L. No. 104-106, § 1342,

110 Stat. 486 (1996).  These actions by both the Executive Branch

and Congress have clearly imposed a binding obligation on this

---

[5]  Similarly, several countries, including Germany, have
arrested and surrendered accused persons to the Yugoslavia
Tribunal.  See Bulletin, International Criminal Tribunal for the
Former Yugoslavia 8 (Jan. 1996) (Dusko Tadic transferred from
Germany to Tribunal on April 24, 1995); Handbook for Government
Cooperation at 17.

16

Court to order the surrender of persons indicted by the Rwanda Tribunal, including Ntakirutimana, to the Tribunal.  The Surrender Agreement and the implementing legislation will be discussed in turn.

### 1. The Surrender Agreement Between The United States and The Rwanda Tribunal

On January 24, 1995, the United States signed a Surrender Agreement with the Rwanda Tribunal.  It is well settled that the Executive Branch has power to enter into such an executive agreement with other countries and international bodies, and that such executive agreements are binding on the United States without ratification by the Senate.[6]

The Surrender Agreement begins by expressly acknowledging the United States' obligation to surrender persons indicted by the Tribunal:

> The United States agrees to surrender to the Tribunal, pursuant to the provisions of this Agreement and the [Rwanda Tribunal] Statute,

---

[6]  See, e.g., Weinberger v. Rossi, 456 U.S. 25, 30 n.6 (1982) (citing cases); see generally United States v. Belmont, 301 U.S. 324, 329-31 (1937) (discussing power of President to enter into binding executive agreements); Richard J. Erickson, The Making of Executive Agreements by the United States Department of Defense:  An Agenda for Progress, 13 B.U. Int'l L.J. 45, 46-85 (1995) (same).  In any event, Congress has enacted legislation to implement the Surrender Agreement, as described below.

17

persons, including United States citizens, found
in its territory whom the Tribunal has charged
with or found guilty of a violation or violations
within the competence of the Tribunal as defined
in the Statute.

Surrender Agreement Art. 1(1).

The Surrender Agreement then sets forth the procedures

for surrender.  The United States' obligations are triggered by a

request for surrender from the Tribunal to the United States.

See id. Art. 2(1).  The request must be accompanied by a

description of the identity and possible location of the person

sought; the facts and procedural history of the case; the

violation or violations for which the person is sought; copies of

the arrest warrant and indictment; and information sufficient to

establish that "there is a reasonable basis to believe that the

person sought has committed the violation or violations for which

surrender is requested."  Id. Art. 2(2), 2(3).  The remaining

Articles of the Agreement provide for the provisional arrest of

persons pending a formal surrender request, see Art. 3; the

transportation through the United States of a person surrendered

to the Tribunal by another State, see Art. 4; and the appearance

of the United States in court in connection with a surrender

request and the payment of expenses, see Art. 5.

18

Article 6 of the Surrender Agreement provides that the Agreement "shall enter into force immediately after the United States has notified the Tribunal that its domestic legal requirements have been met."  The Agreement entered into force on February 14, 1996 after the required notification was given and is, accordingly, binding on the United States.

The Surrender Agreement also provides that "[t]he requirements for a finding that a person is subject to surrender to the Tribunal are solely those articulated in the Agreement," and that "[n]o additional conditions regarding or defenses to surrender may be asserted by the person sought as barring such person's surrender to the Tribunal under this Agreement."  Art. 1(2).  As explained by two commentators who were involved in drafting the Agreement, this provision precludes most of the traditional exceptions to extradition and bars any argument by an accused that there are implied defenses or conditions to surrender which are not articulated in the Agreement or the Rwanda Tribunal Statute.  See Robert Kushen and Kenneth J. Harris, Surrender of Fugitives by the United States to the War Crimes Tribunals for Yugoslavia and Rwanda, 90 Am. J. Int'l. L. 510, 514 (1996) (hereinafter, "Surrender of Fugitives").  As these commentators explain, Article 1(2) of the Agreement

19

"precludes any exceptions based on the accused's nationality, political or military offenses, specialty, time bar, non bis in idem, dual criminality or any other condition not specifically set forth in the Agreement[]." Id. This Article of the Agreement also "incorporates the 'rule of non-inquiry' from bilateral extradition practice," which prohibits court inquiry into matters not set forth in the applicable treaty -- in this case, in the Surrender Agreement and Rwanda Tribunal Statute. Id.

The elimination of traditional exceptions and extraneous defenses to extradition, as Kushen and Harris explain, is justified by the nature of the Rwanda Tribunal and the offenses over which it has jurisdiction. See id. at 514-515. As noted above, the Rwanda Tribinal was established as an enforcement measure under Chapter VII of the U.N. Charter to try persons suspected of the most egregious crimes known to mankind. The Tribunal's Statute purposefully uses the term "surrender" rather than "extradition" to reflect conceptual and operative differences between surrender under the Tribunal's Statute and under traditional bilateral extradition agreements. The nature of states' obligation to cooperate with the Tribunal, including its requests for surrender, is reinforced by the Tribunal's Rules of

20

Procedure and Evidence. Rule 68 specifies that: "The obligations laid down in Article 28 of the Statute shall prevail over any legal impediment to the surrender or transfer of the accused to the Tribunal which may exist under the national law or extradition treaties of the State concerned". See International Criminal Tribunal for Rwanda, Rules of Procedure and Evidence, Rule 68 (ITR/3/Rev.1, 29 June 1995).

The obligation imposed upon the United States by the Surrender Agreement is thus clear. Once the Court determines that the person sought is subject to surrender under the terms of the Agreement, see Agreement Art. 1(2), the United States is obligated to comply with a surrender request from the Rwanda Tribunal.

**2. The United States' Implementing Legislation**

On February 10, 1996, the United States enacted legislation to implement the Surrender Agreement. Section 1342 of Public Law 104-106 provides that, except for limited exceptions concerning admissible evidence and payment of fees and costs:

> the provisions of chapter 209 of title 18, United States Code, relating to the extradition of persons to a foreign country pursuant to a treaty or convention for extradition between the United States and a foreign government, shall apply in

21

the same manner and extent to the surrender of
persons, including United States citizens, to
. . . the International Tribunal for Rwanda,
pursuant to the Agreement.

Pub. L. No. 104-106, § 1342(a)(1)(B).

The surrender of persons to the Tribunal is thus
governed by the provisions of Chapter 209 of Title 18, which
govern extradition proceedings generally, as well as the terms of
the Surrender Agreement. The provisions of Chapter 209 set forth
the procedural and evidentiary rules for extradition proceedings,
see 18 U.S.C. §§ 3184, 3188, 3190, 3191, 3195; confer final
authority on the Secretary of State to surrender fugitives, see
18 U.S.C. § 3186; and permit the surrender of U.S. citizens, see
18 U.S.C. § 3196.

Pursuant to Section 3184 of Chapter 209, federal courts
are authorized to issue a warrant for the arrest of any person
within their jurisdiction who is charged with committing an
offense governed by the terms of an extradition treaty or
convention. 18 U.S.C. § 3184. Section 1342 of Public Law 104-106
specifically extends this authorization to extradite to persons
indicted by the International Tribunal for Rwanda. As the
Government notes in its memorandum, it is well settled that an
extradition obligation can be created by statute, like Section

22

1342, as well as by treaty or convention. <u>See</u> Gov. Rep. Mem. at 4.

In accordance with Section 3184 those arrested are entitled to a hearing before the court that issued the warrant, at which "the evidence of criminality may be heard and considered." 18 U.S.C. § 3184. If the court deems the evidence sufficient to sustain the charge "under the provisions of the proper treaty or convention," the court must so certify to the Secretary of State, in order that the person may be surrendered "according to the stipulations of the treaty or convention." <u>Id</u>. The court, in such circumstances, must also issue a warrant for the commitment of the person pending his surrender. <u>Id</u>. The Secretary of State may then order the person to be surrendered "to be tried for the offense of which [he is] charged." 18 U.S.C. § 3186.

Section 1342, by extending the surrender authority of the Secretary of State to persons sought by the Rwanda Tribunal, thus provides the legal authority for surrendering indictees such as Ntakirutimana. <u>See</u> generally <u>Surrender of Fugitives</u> at 516. Indeed, once this Court determines that Ntakirutimana is charged with offenses subject to the Surrender Agreement and that there

23

is sufficient evidence to support those charges,[7] this Court <u>must</u>
certify to the Secretary of State that Ntakirutimana may be
surrendered to the Rwanda Tribunal.  <u>See</u> 18 U.S.C. § 3184;
Surrender Agreement Art. 2(3).

## II.  THE TRIBUNAL'S STATUTE AND RULES GUARANTEE DEFENDANTS A FAIR TRIAL

The "rule of non-inquiry" generally prohibits courts,
when determining whether to authorize extradition of an accused,
from considering the adequacy of the legal process afforded by
the requesting country.  <u>See</u>, <u>e.g.</u>, <u>Koskotas</u> v. <u>Roche</u>, 931 F.2d
169, 173-74 (1st Cir. 1991) (citing cases); <u>Demjanjuk</u> v.
<u>Petrovsky</u>, 776 F.2d 571, 583 (6th Cir. 1985), <u>cert</u>. <u>denied</u>, 475
U.S. 1016 (1986).  As noted above, this rule is expressly
incorporated into the Surrender Agreement, and is incorporated by
reference into the implementing legislation authorizing surrender

---

[7] As the Government explains, probable cause is the standard
of proof utilized under 18 U.S.C. § 3184.  <u>See</u> Gov. Rep. Mem. at
6.  The Surrender Agreement utilizes the same standard, requiring
evidence "to establish there is a reasonable basis to believe
that the person sought has committed the violation or violations
for which surrender is required."  Surrender Agreement Art. 2(3).
<u>See</u> <u>Austin</u> v. <u>Healy</u>, 5 F.3d 598 (2d Cir.), <u>cert</u>. <u>denied</u>, 114 S.
Ct. 1192 (1993) (probable cause to extradite defendant satisfied
by evidence that supported a reasonable belief defendant was
guilty of the crimes charged); <u>see</u> also <u>Surrender of Fugitives</u> at
513 (Art. 2(3) of Surrender Agreement was intended to adopt the
probable cause standard "applied by U.S. courts in analyzing the
sufficiency of evidence presented in extradition proceedings").

24

of indictees to the Rwanda Tribunal.  However, in view of

respondent's allegations about the unfairness of the proceedings

before the Rwanda Tribunal (see Resp. Mem. at 48), it is

important to reassure the Court that defendants surrendered to

the Tribunal will be treated in accordance with internationally

recognized standards while in detention, that they will be tried

by fair and impartial judges, and that they will be provided with

the guarantees of due process.

First, it must be emphasized that the Court is not

being asked to surrender Ntakirutimana to the government of

Rwanda for trial in the Rwanda courts.  Thus, the problems

detailed at length in respondent's memorandum concerning the

breakdown of the Rwanda justice system -- including the inhumane

conditions of confinement, the detention of thousands of accused

individuals for lengthy periods without bringing them to trial,

and concerns about defendants' ability to get a fair trial -- are

irrelevant here.  The Government here is seeking the surrender of

respondent to an International Tribunal established under the

auspices of the U.N. Security Council.  The Tribunal has been

established at Arusha, Tanzania, and that is where respondent

will be detained and tried, not in Rwanda.  The Tribunal's judges

are respected jurists, of recognized integrity and ability, who

Case 5:98-cv-00043  Document 32  Filed on 05/29/98 in TXSD  Page 60 of 68

were elected by the United Nations General Assembly after a
careful selection process. The Tribunal's Statute and Rules
provide the accused with the recognized international standards
of due process. The operation of the Tribunal is also subject to
continuing U.N. oversight. In light of these protections, there
is simply no reason to question whether defendants before the
Tribunal will be able to receive a fair and impartial trial.

The integrity and impartiality of the Tribunal and the
rights of the accused are protected by the Rwanda Tribunal
Statute and the Rules of Evidence and Procedure the Tribunal has
adopted. The Statute provides for the selection of eleven
independent judges. Art. 11. The judges must be "persons of high
moral character, impartiality and integrity who possess the
qualifications required in their respective countries for the
appointment to the highest judicial office." Art. 12(1). The
judges are selected by the General Assembly of the United
Nations, from a list submitted by the Security Council. Art.
12(3).

The rights of the accused are set forth in Article 20
of the Statute, and include all of the fundamental guarantees of
due process. Each defendant is entitled to a "fair and public
hearing;" to "be informed promptly and in detail in a language

26

which he or she understands of the nature and cause of the charge against him or her;" to have counsel of his or her own choosing, and "adequate time and facilities for the preparation of his or her defense;" to receive a trial "without undue delay;" to be present at trial; to have counsel assigned and paid for, if he or she cannot afford counsel; to confront witnesses against him or her; to compel witnesses on his or her own behalf; to have the free assistance of an interpreter; and not to be "compelled to testify against himself or herself or to confess guilt."  Rwanda Tribunal Statute art. 20.  Judgments must be delivered in public and accompanied by a written opinion.  The maximum penalty is life imprisonment; the Rwanda Tribunal may not impose the death penalty.  Id. Art. 23.  Convicted defendants have the right to appeal to the Tribunal's Appeals Chamber in the Hague. Id. Art. 24; Art. 12 (2).

In addition, the Tribunal has adopted Rules of Procedure and Evidence, pursuant to Article 14 of the Statute, which further elaborate safeguards for the accused provided for in the Statute. These additional safeguards include the right to counsel and an interpreter during questioning by the Prosecutor, as well as the right to remain silent, Rule 42; the right to an arraignment, Rule 62; the right to review material in the

27

possession of the Prosecutor that is either material to the defense or is intended to be used by the Prosecutor at trial, Rule 66; and the right to the disclosure "of evidence known to the Prosecutor which in any way tends to suggest the innocence or mitigate the guilt of the accused or may affect the credibility of prosecution evidence," Rule 68.

Defendants are also entitled to safe and humane conditions during any pre-trial detention.  On January 9, 1996, the Tribunal adopted comprehensive "Provisional Rules Covering the Detention of Persons Awaiting Trial or Appeal Before the Tribunal or Otherwise Detained on the Authority of the Tribunal," ICTR/2/L.3.  See Handbook for Government Cooperation at 31.  The Tribunal has also adopted regulations that govern the supervision of visits and communications with detainees and establish disciplinary procedures.  Id.  These procedures and regulations insure that treatment of detainees is consistent with recognized international standards, including the U.N. Standard Minimum Rules on the Treatment of Prisoners and the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.  Id. at 30.  Lastly, the Tribunal's detention unit in Tanzania is subject to inspection by the International Committee of the Red Cross, the pre-eminent organization in the

28

field, to ensure "compliance with international standards." Id.
at 31.

The Rules of Procedure and Evidence also contain
important protections and requirements for witnesses. As noted
above, the accused has the right to call witnesses on his behalf.
Rule 85. Rule 75 allows Trial Chambers to "order appropriate
measures for the privacy and protection of victims and witnesses,
provided that the measures are consistent with the rights of the
accused." Rule 34 creates a Victims and Witnesses Unit that is
directed to recommend protective measures and to provide
counselling and support for witnesses. Rule 90 requires that
witnesses' testimony generally must be heard in person before the
Trial Chamber, and that the witness must be sworn to tell the
truth. Rule 91 provides that witnesses who commit perjury may be
punished by the Tribunal by a fine of $10,000 or one year
imprisonment, or both.

Finally, any defendant tried or convicted by the
Tribunal may not be tried for the same offense before national
courts. Rwanda Tribunal Statute, Art. 9. Thus, a defendant
indicted and tried by the Rwanda Tribunal may not also be tried
by Rwandan national courts. Moreover, neither the Statute nor
the Rules has any provision that would allow for the transfer of

29

defendants from the Rwanda Tribunal to the Rwandan national courts.

The Statute and Rules provide that defendants convicted by the Tribunal shall serve their terms of incarceration in "Rwanda or any State designated by the Tribunal from a list of States which have indicated their willingness to accept convicted persons." Rule 103; Rwanda Tribunal Statute, Art. 26. However, all sentences of imprisonment are subject to the supervision of the Tribunal or a body designated by it. Rule 104. As of July 1996, Austria, Belgium, Denmark, Norway, Sweden and Switzerland had enacted legislation permitting acceptance of convicted persons; Australia, Canada, France, Luxembourg, New Zealand, Poland, Tanzania, Uganda, the United Kingdom, and the United States had informed the Tribunal of their plans to draft such legislation. Handbook for Government Cooperation at 35. There is no reason to believe that after conviction respondent would be returned to Rwanda to serve his prison sentence.

A recent report of the United Nations Office of Internal Oversight Services (OIOS) criticizes the operation of the Rwanda Tribunal, but its findings to not reflect on the respondent's ability to obtain a fair trial before the Tribunal. See "Financing of the International Criminal Tribunal", Report of

30

the Secretary-General on the Activities of the Office of Internal

Oversight Services (U.N. Doc. A/51/789, 6 February 1997).   The

Report describes significant instances of administrative

mismanagement and violations of U.N. rules and regulations in the

Tribunal's expenditure of funds and hiring of staff.  The Report

also criticizes the slow progress being made in developing a

witness protection program. These are serious problems which need

to be addressed by the United Nations. However, the deficiencies

documented in the Report are limited to administrative,

management and personnel problems in the Tribunal's Registrar's

Office in Arusha, Tanzania, and in the Deputy Prosecutor's Office

in Kigali, Rwanda.

     The report does not place in doubt the judicial

independence of the Tribunal or the fairness with which

defendants are treated.   The Report does not criticize or

question the ability or integrity of any of the judges sitting in

Arusha.   It does not criticize or question the capacity or the

commitment of the Prosecutor and the Tribunal to conduct fair and

impartial trials.  And the Report, finally, does not criticize or

question the treatment of pre-trial detainees.   Thus, while the

Report identifies areas that need prompt administrative

improvement, none of these problems call into question the

31

fairness with which defendants shall be charged, detained and tried. Therefore they do not provide reason to refuse to surrender persons to the Tribunal.

## III. CONCLUSION

For the foregoing reasons, the Lawyers Committee for Human Rights respectfully submits that the United States is obligated to comply with surrender requests made by the Rwanda Tribunal, pursuant to the Surrender Agreement and the domestic legislation implementing the Agreement, as well as under international law. Accordingly, if this Court determines that there is probable cause to believe that Ntakirutimana has committed the crimes with which he is charged, the Court must certify to the Secretary of State that Ntakirutimana may be surrendered.

Dated:    April 25, 1997
          New York, New York

                        Respectfully submitted,

                        LAWYERS COMMITTEE FOR HUMAN RIGHTS

                   By:  _____
                        Michael Posner, Executive Director

                        330 Seventh Avenue
                        New York, New York
                        (212) 629 6170

                        32

By: _____

    Ricardo De Anda

    de Anda Law Firm
    212 Flores Avenue
    Laredo, TX 78040
    (210) 726 0038

33

# AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

Michael R. Potenza, being duly sworn, deposes and says:

1.     I am over the age of 18 years and am not a party to this action.

2.     On Friday, April 24, 1998, I caused to be served via Federal Express copies of a) a Motion for Leave to File Brief of the Lawyers Committee for Human Rights as Amicus Curiae and b) the Brief of the Lawyers Committee for Human Rights as Amicus Curiae in the case captioned In the Matter of the Surrender of Elizaphan Ntakirutimana, Misc. No. L-98-2, in the U.S. District Court for the Southern District of Texas, Laredo Division, upon:

> Don DeGabrielle, Esq.
> Assistant U.S. Attorney
> United States Attorney's Office
> Southern District of Texas
> Special Prosecutions
> 901 Travis, Suite 1500
> Houston, TX 77002
>
> Ramsey Clark, Esq. and
> Lawrence W. Schilling, Esq.
> 36 East 12th Street
> New York, NY  10003

Michael R. Potenza

Sworn to and subscribed before me
this 24th day of April, 1998

Notary Public

MARILYN D. HAAS
Notary Public, State of New York
No. 41-4838861
Qualified in Queens County
Certificate Filed in New York County
Commission Expires June 30, 19__